Good morning, Your Honors, Counsel. My name is Mitch Peskin. I'm representing the Plaintiff Appellant, Anthony Johnson. I just want to start off with a brief procedural history of the case. The matter was tried before the arbitrator on January, excuse me, January 11th. The arbitrator had issued her findings on January 31st, 2011, and found that Johnson had sustained an accidental injury on June 17, 2009, arising out of and in the course of her employment. And she also found that his condition was related to that accident. Frank Pack reviewed the decision before the Commission, which thereafter affirmed the arbitrator's findings on causation. The dissenting Commissioner wrote that the June 17, 2009 accident was a clear aggravation of Johnson's low back condition, and cited CISBRO in support of his opinion. We then filed an appeal to the Circuit Court in Kane County, which confirmed the Commission's decision, and this appeal followed. It's our position that the Commission was incorrect in reversing the arbitrator's decision on causation. The Commission's decision that there was no causal connection between Johnson's accident and his condition of ill-being was against the manifest way to be evidenced. Kennedy. What did Dr. Mather say? Pack. I'm sorry? Kennedy. What did Dr. Mather have to say? Pack. Dr. Mather was of the opinion that there was not a causal connection. He believed that the symptoms the Petitioner experienced on that particular day were related to his preexisting back condition. Kennedy. So what's wrong with his opinion? Pack. Well, in this case we have a very specific work accident that Johnson had. Johnson is he's got his right foot on the base of a press machine. He's hunched over. He's got both his hands on a press cylinder that's 400, approximately 400 pounds. He's pulling the press cylinder toward him. It's stuck. He's jerking it. It finally jerks loose, and the moment it jerks loose, he's experiencing back pain and right leg pain. It's a very specific accident. And from that point in time, Johnson's condition progressed and worsened. He had a consistent course of treatment. And the job that he was performing up to that time wasn't a light duty job. This is a job that was somewhat physical. He had a lift, carry up to 64 pounds. He had to frequently pull 68 pounds. And he was able to perform this job five to seven days a week, working 40 to 64 hours a week. He did the job for eight months, except for two weeks. So he's working this heavy duty job, and then he has this specific accident, and bam, he has the symptoms. This fact, excuse me, after this accident occurred, shortly thereafter, he was no longer able to perform this job. And this is a fact that's not disputed. In looking at the medical evidence, one of the most important pieces of diagnostic evidence is the EMG of November 23, 2009. The EMG is a test for nerve damage. In this case, the doctor who performed the EMG is Dr. Purcell, and the EMG results showed bilateral moderate degree of radiculopathy at L5-S1, appearing to be acute on the right and chronic on the left. Besides the fact that the EMG showed an acute radiculopathy, which Dr. McNally had opined is indicative of a more recent injury, what's very important to note is Johnson had an EMG back in December of 2007, and that was normal. So we have a significant change in two EMGs, one before the accident, one after the accident. So the EMG is perhaps the strongest piece of diagnostic evidence that we have that shows a change in Johnson's condition following his accident, and it shows findings that are consistent with the complaints that Johnson had. The other test that Dr. McNally prescribed, he prescribed the EMG, but he also prescribed a CT myelogram, which was performed in December of 2009. Per Dr. McNally, this test is a little bit more detailed in terms of the anatomic study of the neural elements in one's back as compared to an MRI. Dr. McNally testified that the nerve exits, and this, per Dr. McNally, was consistent with the symptoms that Johnson was experiencing. So there's a lot of diagnostic tests in the record, and to address the medical evidence in these diagnostic tests and interpret it, we have the testimony of two different doctors. We've got the petitioner's treating doctor, Dr. McNally, and the respondent's section 12 examiner, Dr. Mather. Can I ask a question? Did your client go to the emergency room at Sherman Hospital in December of 2007 reporting some type of an accident in November, and an X-ray showed mild disc spacing narrowing at L5-S1? I believe that's correct. And did he undergo a lumbar spine MRI in December of 2007 that was ordered by Dr. Gebhardt that revealed advanced osteoarthritic changes at L5-S1? Did that happen? It did. And he also underwent an EMG at that same time, too. Okay. And did the Sherman Hospital report of December of 2007 indicate that he suffered from chronic low back pain, which had worsened after heavy lifting in November of 2007? Yes, sir. And how is it that Dr. McNally indicated that prior to the event of June 17, 2009, your client was asymptomatic? How did he come to that conclusion? Because the records you're referring to are from December of 2007. It was a year and a half or two years prior. And at that time, Johnson was in need of some treatment. He treated a brief period of time, and then he didn't have any ongoing treatment. I think Dr. McNally said it was a small exacerbation, but nothing prolonged that required him to be on any continuing pain medications or have additional treatment. He also indicated in a medical history form when he was hired by this employer that he had no back problems or back injury and had never undergone any operations, didn't he? Yes, he did. And it is illegal for them to check the worker's compensation to determine if he's telling the truth, isn't it? That's correct. Johnson had testified that the reason he didn't report his back problems is he didn't think the employer was able to legally ask that question. I'm not saying that's right, but that was his understanding, and that's why he didn't report it. Let me cut to the chase. Clearly, McNally gave a causal connection in favor of the claimant. He had neither on the opposite side. So tell us, how then do we overturn the Commission's decision without doing violence to the principle that we're not supposed to substitute our judgment for that of the Commission, particularly on issues of medical evidence? So how do we do that? Sure. The basis of my argument, essentially, is the Commission, in order to have found against causation, must have relied on Dr. McNally's testimony. I'm sorry, Dr. Mather's testimony. Dr. Mather's testimony was not credible, and I want to elaborate on this. The purpose of Dr. Mather's deposition, excuse me, examination of Johnson was in part to address the causal relationship of his condition to the work injury. So he examines him, I He doesn't collect any information from Johnson about the accident. On cross-examination, Dr. Mather testified he didn't know the approximate weight of the cylinder. He didn't know how Johnson had positioned himself while removing the cylinder. He didn't know if Johnson was bent over. At the time of his deposition, he didn't have any recollection as to what Johnson's job activities were. And he had not even known how long Johnson had been working for PrintPak up until his date of accident. And more importantly, and this is the main point of my argument, Mather presented an inconsistent testimony. He was presented medical evidence to review an EMG, the EMG of November 2009. He thereafter, examining, after reviewing that evidence and some other evidence and examining Johnson, he writes it in his report, and he accepts the findings of Dr. Purcell concerning the EMG with just the left side. He acknowledges the left radiculopathy, goes so far as to capitalize the word left in his report, and then, strangely, just completely disregards Dr. Purcell's findings that Johnson had acute radiculopathy in his right leg. And not only does he do that, he basically says the EMG shows no abnormalities in the right leg. This is directly contrary to what Dr. Purcell's report says. And then during his direct testimony again, he contradicted Dr. Purcell's findings. On examination, he was asked about the EMG. He said that the EMG was normal for the right leg. He testified there were no findings in the right extremity. When he was further pressed on this inconsistency during cross-examination, for the very first time, Dr. Mather acknowledges, you know what, the EMG was abnormal, not just on the left side, but on the right side. And even further, he acknowledges, you know what, it's not just neuropathy on the left side, there is neuropathy on the right side. But then he comes up with this brand new theory to explain all the findings on the right side. Just magically, he comes up and says, you know what it is? It's diabetic neuropathy. Out of nowhere. Now, he's written two reports. He's testified in direct examination. And then finally when he's pressed on this issue during cross-examination, he makes up a finding. There's no evidence that Johnson was diabetic. None of the medical records ever indicate he had diabetes or treated for diabetes. He himself, Johnson himself testified he's never had diabetes, he's never seen a doctor for it. And Dr. Mather waits until cross-examination to come up with this attributable to his right leg radiculopathy to diabetic neuropathy. It's a brand new theory. The arbitrator had a real problem with that. And I think that was incorrect. I think that Mather was completely inconsistent. I think he was fabricating his opinions. And I submit that these inconsistencies overwhelmingly call into question his credibility. And if you take away Dr. Mather's testimony, what's the remaining evidence you have? You have the medical expert, Dr. Vinali, who established. I'm sorry. You're asking us to disregard Mather's testimony when the commission didn't? Correct. I don't think the commission should have. I don't think Dr. Mather is credible. I think he clearly. Counsel, hang on. The commission took into account this issue about the diabetic retinopathy or diabetic neuropathy. And they said even if the EMG findings were not explained by diabetes, the right-sided leg and low back symptoms were not new after June 17, 2009. And Petitioner had right-sided back symptoms going back to November 2007. So they did take into account this issue that you're explaining here, right? I don't think so, Your Honor. They took into consideration that there were findings going back then. I don't think they took into consideration how Mather testified to those findings. My point is he was inconsistent. He had said he ignored findings and then he changes his opinion and comes up with some new theory. I think he was just trying to get around the issue. He writes a report. His purpose is to examine and figure out if there's a causal relationship. And he ignores the most significant piece of evidence, an EMG that's showing acute radiculopathy. He's going out of his way not to put that in his report, to kind of disregard those findings. And then when he was really pressed on it, then all of a sudden he changed and he comes up with all these theories that there's no support. And if you take that out of the equation, the remaining evidence, you've got McNally who testified that the accident aggravated the condition. You have the fact that Johnson had a specific work accident with an immediate drastic change in his condition following the accident. We have the fact that a surgical recommendation is being now made to address not just his low back complaints but his right leg complaints. We have a mechanism of injury that's compatible and consistent with causing a low back injury. You've got the objective evidence of the CT myelogram. And you have the objective evidence of the EMG showing a significant difference from his pre-accident EMG, mainly that he has an acute radiculopathy. And this EMG findings were consistent with the symptoms that Johnson was experiencing. In other words, the remaining evidence would only point to one conclusion, that Johnson's condition of ill-being is causally related to his work accident. And we are asking this Court to reverse the Commission's decision. Thank you. Thank you, Counsel. Counsel, you may respond. To please the Court, Counsel, Mark Matranga for the Respondent Appellee Print The incident in which Mr. Johnson was involved in the summer of 09 did not exist in a vacuum. We heard nothing over the last 15 minutes about the history of this man's condition, a condition which even Dr. McNally admitted had deteriorated to the point where in June 2009, any type of activity could have caused symptoms. What was the history? A significant injury in 2004, after which there were two lumbar surgeries, at the same level we're talking about here, L5-S1. Dr. Goldberg examined Mr. Johnson in connection with that incident in 2008. And Dr. Goldberg in 2005, I believe, August, he felt the man was not at maximum medical improvement, that he needed another surgery, needed a lumbar fusion. He predicted what happened. Mr. Johnson eschewed the idea and went on from there. But Dr. Goldberg was not engaged in this type of work anymore. The Respondent Employer, at the time of the 2004 incident, was the same type of work he was doing for print back. Indeed, when he settled that case in 2006, I do not have the month, my apologies, but when that case was settled in 2006, it stated right on it that he could not return to his work at the employer. Now, there's a way of explaining, I guess, what that means or what it was supposed to have meant. But in light of the medical history, it was obvious that those pink sheets, as we call them, made reference to the fact that he shouldn't be doing this kind of work anymore. After all, we did have Dr. Goldberg. We know he shouldn't have been doing that work, but how is that relevant to the issue in this case? They hired him. And we understand that they have no way of knowing what his condition was before they hired him because of the state of the law. But the fact of the matter is they hired him. That means they took him as they found him, with a terrible back. The question in this case is, is his present back condition causally related to the event that happened at work on June, what, 19th or whatever date it is, or is it merely as the result of this terrible condition of his back that existed before that date? It's not a question of whether he should have been working or shouldn't have been working. Oh, I do not disagree with you, Your Honor, but what I'm trying to do is recite a little bit of history. But he was treated as late as February of 2009 for a bad back. Excuse me. By Dr. Gephardt. We know that. Exactly. But again, we need to understand that this man's condition didn't commence in June of 2009. We know that. And we didn't hear anything about it. But the question is, do we have an aggravation of a preexisting injury, or do we have a condition that has been caused by something totally unrelated to the lifting of that thing, which is what the commission found? Oh, I can fast-forward and tell you, Your Honor. Oh, please do. First of all, there was no accident arising out of it in the course of his employment. We've claimed that all along. And second, there is no causal connection between the events of June 2009 and the condition of his low back, which, again, Dr. McNally testified. I think the key pages are 502 to 510, 58. You'll see this testimony from Dr. McNally. He admitted this condition had deteriorated to the point where any kind of twisting, bending, this was the condition of his back. Anything could have caused it. And, yes, there certainly is a question. Well, didn't this constitute an accident? He was working. He was pulling the cylinder. But when we look at what the definition of an accident is, something unexpected, I think that's something that happens unexpectedly. That's Matheson. We have the old Laclede Steel case, you know, where someone's physical structure breaks down. We didn't have that. And also we have the Bagot case, which I think is even older. This gentleman's condition of the ill being could have happened that night as he rolled around in bed, right? Dr. McNally said that. And the commission is free to find that. Is that not the case? Well, we can say yes or no. The commission can find that. As a matter of fact, can't they? That his condition had deteriorated to a point where he could have happened rolling around in bed at night? Oh, they could have. They obviously did not. But I submit to you, Your Honor, again, we, meaning the Respondent, never stipulated that there was an accident because, again, this man's condition, preexisting condition, is the sole cause of his problem. Nothing that happened to him in June of 2009 contributed to his condition. And I think that's the logical conclusion if the commission determined that it could have happened in bed at night, wouldn't it, Mr. Matranka? Again, I don't disagree with you, Your Honor. But this is more of a legal issue. We don't disagree on the facts. We don't disagree as to what happened to Mr. Johnson, what he was doing, et cetera. What we are submitting is this wasn't sudden and it wasn't unexpected. This was a long trail of facts, a long trail of deteriorating condition to the point where his body. You don't understand what I said to you there. Well, you're asking if the commission was free to find, as a matter of fact, that he had sustained an accident. No. I said, was the commission free to find exactly what your doctor said? His back was so deteriorated that this injury to him could have happened if he rolled around in bed at night. Well, yes, certainly. We don't disagree with that proposition. Thank you. It seems like you're being tricked into saying something you shouldn't say. No, no. I understood Your Honor's question to mean that wasn't the commission free to determine if the accident. Sometimes I flip softballs. I don't always go after you. No, well, maybe I'm used to the other. Probably a rare occasion. I'm used to the other, and so I'm not responding, at least based on the last time we talked about the big Lebowski. The big Lebowski? That was a long time ago in a galaxy far, far away. But in any event, Your Honor, it took your question to mean isn't the commission free to find an accident or to find that this could have happened rolling over at night. And all I was saying is that I don't think they were free to find an accident because I think agreeing on the facts as we agree on these facts, I don't think you can find an accident. But moving to the causal connection opinion decision, it is clear, just as Harris pointed out, the question about the diabetes, that's a red herring. That certainly is not a major part of our case. Dr. McNally acknowledged that Mr. Johnson had right-sided symptoms, right-leg symptoms, both in 2007 and 2009. Unfortunately, we don't have an EMG from 2009 February. That might have shown us lots of stuff. It's not there. Can't argue something that's not there. That's a dog that's not barking at night. But I will tell you this much. This man's condition was deteriorating. Dr. McNally acknowledged it. It's just very clear that this man with a calcified L5S1 disc, with bony overgrowth, was an accident waiting to happen. We do have the CISPRO doctrine which states that if any type of activity is going to cause the body to break down, that that is a condition that's not work-related. I will close by reminding us all that not everything that happens at work is compensable. This happens to have been one of those events. Thank you. Thank you, Counsel. Counsel, you may reply. Thank you. I don't really understand the Respondent's argument to say that this isn't an accident. The petitioner, Johnson, had been working at this job. He worked there for eight months. There's a two-week period in February he didn't work where he had treated, he was off work. But other than that, he's working. It's not a light-duty job. He's doing a very specific, very kind of an awkward position that he's in when he's pulling the cylinder. He's clearly exposed to a greater risk than the general public by having to perform that maneuver. And while performing that, his symptoms change. His condition changes. It's aggravated. It's accelerated. We acknowledge he's got a bad back. He's had it for a long time. But this accident aggravated that back. It made it worse. He couldn't work pretty much anymore after that. His symptoms were consistent and continued since that time. They never resumed. And now he has a consistent right-legged radiculopathy that's been, as we talked about extensively, it's evidenced by the EMG. There's a change in the symptoms that's documented objectively, not just with his subjective complaints, but also objectively. He treated immediately after the accident. He gave notification to his supervisors, his human resource people about the accident. None of them were called to dispute any of that. Clearly the accident happened. And as I had said before, I don't believe that Dr. Mather's opinions should be considered because he was inconsistent. And I think he essentially lied in his deposition testimony and avoided issues. He was trying to certainly fabricate or make his opinions consistent while ignoring some vital evidence. So I think when you eliminate that, the totality of the evidence would mandate that there is a causal connection between Johnson's accident and his condition of well-being. And we ask again that this Court reverse the Commission's decision on that issue. Thank you. Thank you, counsel. We'll take this matter under advisement for written dispositional issue. The Court will stand at brief recess.